HOOSIER CASUALTY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8786.    Promulgated May 13, 1927.

1. Where a stock insurance company was organized to take over the business of a mutual insurance company and where only a fraction of one share of stock out of a total issue of 2,000 shares was acquired by the members of the mutual company, *held*, that these facts did not constitute a reorganization.

2. Where a stock insurance company on the day it began business took over the business of a mutual insurance company, which had been issuing combined policies of death, health and accident insurance, and on the next day took over the business of an automobile insurance company, *held*, that the stock company was not for the first fractional day of its existence a " life insurance company " as that term is defined in section 242 of the Revenue Act of 1921.

3. The net income of an insurance company, other than a life or mutual insurance company, is taxable under section 246 of the Revenue Act of 1921 for the year 1921, at the rate prescribed by section 230 (a) of that Act.

4. Where a stock insurance company assumed the risks of a mutual insurance company in consideration of the transfer to it of the net surplus of the mutual company, *held*, that the transaction was one of reinsurance and that the net surplus so received was a single net premium and was income to the stock insurance company in the year received.

*Harry A. Fellows, Esq.,* and *Will H. Latta, Esq.,* for the petitioner.

*J. D. Foley, Esq.,* for the respondent.

This proceeding involves the redetermination of a deficiency in income and profits tax for the year 1921, in the amount of $35,426.71, arising from the fact that the Commissioner has determined that the net amount of $105,959.60 received in 1921 by the petitioner from a mutual insurance company of the same name was a net premium for the reinsurance by the petitioner of the risks of the mutual company.

### FINDINGS OF FACT.

The Hoosier Casualty Co., a mutual and nonstock insurance company, and hereinafter referred to as the Mutual Company, was organized under the laws of the State of Indiana as a mutual insurance company, in the year 1907. About 90 per cent of the policies issued by said company were what was styled " Perfect Policy." The material provisions of this policy read:

HOOSIER CASUALTY COMPANY.

Health and Accident Insurance.

Indianapolis, Indiana.

(Hereinafter called the Company.)

IN CONSIDERATION of the policy fee of $2.00 and of the payment of the premium of 1.00 Dollar in advance, and of application hereof, copy of which is endorsed hereon and made a part of this contract,

DOES HEREBY INSURE John Doe, the person described in " said application," who states his occupation to be car loader, duties handling sacks subject to all of the provisions, conditions and limitations herein contained and endorsed hereon, and not otherwise, from 12 o'clock noon, standard time, of the day this contract is dated, until 12 o'clock midnight, standard time, of the last day of September, 1916, and for such further periods, stated in the renewal receipts. as the payment of said premium as specified in " said application " will maintain this policy and insurance in force, to-wit:

ACCIDENT INDEMNITY—TOTAL LOSS OF TIME.

(a) At the rate of $30.00 dollars per month, for a period not exceeding twenty-four consecutive months against total loss of time resulting necessarily, directly and independently of all other causes from bodily injuries other than such as result in one or more of the specific losses mentioned in paragraph (c), effected through external, violent and accidental means, and which immediately, wholly and continuously from date of accident disable and prevent the Assured from performing every duty pertaining to any business or occupation, not exceeding twenty-four (24) consecutive months for any one injury.

ACCIDENT INDEMNITY—PARTIAL LOSS OF TIME.

(b) But, if such injuries so received shall wholly and continuously from date of accident disable and prevent the Assured from performing one or more important daily duties pertaining to his occupation, or in event of like disability immediately following total disability, or in event of total disability not immediately following injury, the Company will pay the Assured for the period of any such disability, not exceeding six (6) consecutive months, fifty per cent. of the rate specified in paragraph (a). Provided, that the maximum period for which indemnity shall be paid under paragraphs (a) and (b) hereof shall not exceed twenty-four (24) consecutive months.

SPECIFIC INDEMNITY.

(c) But, if any of the following specific losses result solely from "such injuries" as defined in paragraphs (a) or (b), within ninety days from date of accident, the amounts stated below shall be paid regardless of the length of disability or any other or additional injuries, to-wit:

For loss of Life_____Three Hundred_____Dollars (The principal sum).
For loss of Both Hands, by severance at or above the wrist joint—
The principal sum.
For loss of Both Feet, by severance at or above the ankle joint—
The principal sum.
For loss of One Hand and One Foot, by severance at or above said joints—
The principal sum.
For loss of Entire Sight of Both Eyes, if irrecoverably lost—
The principal sum.
For loss of Either Hand, by severance at or above the wrist joint—
One-half the principal sum.
For loss of Either Foot, by severance at or above the ankle joint—
One-half the principal sum.
For loss of Entire Sight of One Eye, if irrecoverably lost—
One-third the principal sum.

Which amounts are to be paid and received in lieu of any other indemnity, and shall measure the total liability of the Company under the circumstances stated, all other provisions of this policy to the contrary notwithstanding.

DOUBLE INDEMNITY.

(d) But, if such injuries are sustained by the Assured (1) while passively riding as a passenger within the enclosed part of any railway passenger car provided for the exclusive use of passengers and propelled by steam, cable, compressed air or electricity; (2) or, while so riding as a passenger on board a steam vessel licensed for the regular transportation of passengers; and such injuries shall be due directly to or in consequence of the wrecking of such car or vessel, then the Company will pay double the indemnity, otherwise payable under paragraphs (a) or (c), as the case may be.

FIFTY PER CENT ACCUMULATION.

Each consecutive yearly renewal of this policy shall add TEN PER CENT. to the original amount specified above referring to specific indemnity; but all such additions shall never exceed FIFTY PER CENT. of such original amounts.

79705°—28——85

### SURGEON'S FEES—NON-DISABLING INJURIES.

(e) Or, if "such injury" sustained by the Insured shall not disable him or entitle him to any other indemnity under this policy, but shall require surgical treatment by a legally qualified surgeon, the Company will reimburse him for the cost of such treatment in an amount not to exceed three dollars, provided, that the attending surgeon's receipt and affidavit on the Company's blanks are furnished the Company within ninety days from date of the accident.

### ILLNESS INDEMNITY.

FULL INDEMNITY. (f-1) Or, at the rate of $30.00 Dollars per month, after the first seven days, for a period not exceeding twelve consecutive months, that the Insured is necessarily and continuously confined within the house and therein regularly visited by a legally qualified physician, solely by reason of illness or disease, other than as hereinafter referred to or provided for, that is contracted and begins after this policy has been maintained in continuous force for thirty days; and that wholly and continuously disables the Assured from performing every duty pertaining to any business or occupation.

PARTIAL INDEMNITY. (f-2) But, at One-Half the rate as provided in Clause F-1, not exceeding two consecutive months, for a period of convalescence immediately following such confinement in the house, or by reason of any non-confining illness during which the Insured shall be wholly and continuously disabled and prevented from performing every duty pertaining to any business or occupation, and is regularly treated by a legally qualified physician. Provided, that the maximum period for which indemnity shall be paid under Clauses F-1 and 2 hereof shall not exceed twelve consecutive months.

Provided, that indemnity under this Part shall not be paid for disability due directly or indirectly to venereal disease or to any illness not common to both sexes.

### FUNERAL INDEMNITY.

But, if the death of said member results from sickness, not exempted or otherwise provided for, in this policy, originating after this certificate has been continuously for thirty days, without delinquency, in full force and effect, immediately preceding the beginning of said sickness, the Company will pay in lieu of any other indemnity, $100.00 funeral indemnity, but if benefits accrued from sickness, according to paragraph (f), exceed the amount of the death indemnity of this contract the beneficiary shall receive said amount in lieu of said death indemnity.

### SPECIAL DISEASES.

(g) Or, if the Assured contracts rheumatism, consumption, tuberculosis, paralysis, sciatica, neuritis, Bright's disease, lumbago, cancer, hernia or any chronic disease after this policy has been maintained in continuous force for thirty days immediately preceding, the Company will pay the Assured the same rate of indemnity as provided in paragraph (f), subject to the provisions and conditions of said paragraph, for a period not exceeding three consecutive months.

The Mutual Company also issued other policies called " Commercial Policies," covering accidental death only, and which were issued

on a quarterly or annual premium payment plan. In January, 1921, the Mutual Company had accumulated a net surplus of $105,959.61. In January, 1921, C. H. Brackett was the president of the Mutual Company, W. H. Latta was vice president, and C. W. Ray was secretary and treasurer. These persons were also directors of the Mutual Company. In the latter part of 1920, the above officers and directors controlled and operated in the same office a reciprocal insurance association, writing automobile insurance for fire, theft, collision, and property damage coverages. They owned an agency which controlled the insurance association through contract arrangements. Being desirous of consolidating all of the business transacted by them in the same office and of acquiring sufficient funds from the Mutual Company with which to purchase the automobile insurance business, and since this could not be accomplished under the charter held by the Mutual Company, the above-named persons proposed to and did organize the petitioner company, hereinafter called the Stock Company, with a capital stock of $100,000, of which $50,000 was issued and paid for at once and the balance was to be issued as hereinafter stated. In order to effect this change, the following letter was sent to every policyholder in the company:

O. H. Brackett, President                              C. W. Ray, Sec'y-Treas.

### HOOSIER CASUALTY COMPANY.

#### Health and Accident Insurance.

##### Indianapolis.

DEAR SIR:

This is to give notice that a special meeting of the policy holders of the Hoosier Casualty Company, is to be held at the office of the Company, 1510 Fletcher Savings and Trust Company Building, Indianapolis, Indiana, on Saturday, January 1, 1921, at 9:00 A. M. The purpose of this meeting is to act upon a contract whereby the insurance of this Company will be taken over and conducted by a company to be known as THE HOOSIER CASUALTY COMPANY.

This new company will be managed by the same persons; operated in the same manner as the present Hoosier Casualty Company, the only difference being that it will be a stock company with a capital of ONE HUNDRED THOUSAND DOLLARS, while the present company is a Mutual Company.

The present company, as a mutual company, is obliged by law to have a condition in its policies giving the power to levy extra assessments. This is objectionable to the public and a disadvantage in competition for business. It is not liked by many of our policy holders.

The new "The Hoosier Casualty Company", as a stock company will completely do away with this condition in its policies and there can be no extra assessments. This is an advantage to you as a policy holder, a great advantage to our agency force, and a source of strength to our Company.

The plan and contract under which these changes are to take place must, under the law, be approved by the Insurance Department of the State of

Indiana, which assures you that your interests are protected, and your policy will not be changed in any way except that extra assessments can not be made.

The changes will result in a greater, stronger and better Hoosier than is possible under the present assessment Insurance laws under which we now operate, and with

> No change in management.
> No change in the general conduct of the business.
> No change in the cost of your insurance.
> No change in benefits provided for in your policy.
> No extra assessments possible.

Very truly yours,

> C. H. Brackett, President.
> C. W. Ray, Sec'y-Treas.

This letter appears to have received the approval of the Insurance Commissioner of the State of Indiana, which approval he expressed in letter dated December 23, 1920. On the 30th day of December, 1920, Ele Stansbury, as Attorney General of the State of Indiana, filed his suit in the Superior Court of Marion County, Indiana, against the Mutual Company, the Stock Company, and the stockholders and officers of the Stock Company. After setting forth the incorporation of the two companies and that the defendant Charles H. Brackett was the president of the Mutual Company, that defendant Cyrus W. Ray was secretary-treasurer, that defendant Blanche Belser was the bookkeeper, William H. Latta was the general counsel and Flora Wredge was a stenographer in said company, and that the other defendants were wives or members of the immediate families of or close relatives of said officers, alleged that the proposed plan by which the Stock Company should acquire the assets of the Mutual Company was the result of conspiracy whereby the Stock Company would acquire and the defendants become the equitable owners of all the business, property and assets of the old company without paying any consideration therefor to the policyholders and members of the old company. The plaintiff prayed for an injunction restraining the defendants from carrying out their plan and also for a receiver for the Mutual Company. Thereafter the court issued the injunction applied for, but refused until further hearing to appoint a receiver. On the first day of January, 1920, the following order was entered in said action:

Come now the parties by counsel in the above entitled cause and submits to the Court a compromise agreement of said cause, made subject to the approval of the Court. And the Court now finds that said agreement should be approved, and pursuant to said agreement and said finding, it is now considered, adjudged and decreed by the Court that the injunction be made permanent as against further proceedings at the special meeting of the policyholders of the defendant mutual Hoosier Casualty Company called for nine o'clock A. M. January 1st, 1921; without further notice to said policy-holders,

and that said meeting shall either be adjourned *sine die*, or at the option of defendants, adjourned to a date, not earlier than the 18th day of January, 1921.

That if said meeting shall be adjourned to such later date for the consideration of either the *proposed re-insurance* contract referred to in the notice of said special meeting of policy-holders theretofore given, and in plaintiff's complaint or to consider *any other re-insurance* contract, or if another meeting shall be called by defendants or any of them for any such purpose, then or in either event ten days written notice shall be mailed to said stockholders notifying said stockholders of the date of said adjourned meeting or further meeting, and said notice shall contain a statement in such manner as the same may be fully understood and comprehended by a person of ordinary intelligence, in substance of at least the following facts:

1. The name of the *re-insuring Company*.

2. Whether a stock Company or a Mutual Company.

3. Whether a newly organized Company or an old and established company, and if an old and established company, the amount of insurance in force; if a new company, a statement showing who subscribed for all the capital stock of such new company.

4. *The consideration to be paid for such re-insurance.*

5. That the policy-holders of the defendant mutual Hoosier Casualty Company are the *equitable owners*, of all the property, assets and business of said company, subject to the corporate right of said company to use the same for its corporate purposes and to discharge its corporate obligations; the legal title being vested in said company, and that if a stock company *shall reinsure the business of said defendant mutual company, in consideration of the transfer to it of the business, property and assets of said mutual company,* then all the interests of said policy-holders in said property, assets and business will be tranferred to said stock company and its stock-holders, and not to its policy-holders except that same will remain a security for the insurance covered by the policy of said policy holders.

6. *That there is no statute authorizing the re-incorporation of the defendant mutual Hoosier Casualty Company, and that the defendant The Hoosier Casualty Company is not a re-organization of that company,* and that if any of the policy-holders of said defendant Mutual Company desire to purchase any of the stock of said new company and will forward their certified check therefor to the president of the defendant mutual company, stock to an amount equal to an equity in the mutual company standing to the credit of his policy, after all debts of that company are ascertained, may be purchased and will be issued to said policyholders at par.

7. Said notice shall not contain a statement in substance or otherwise, that any State department or officer is chargeable by law with the duty of the safe-*guarding* of the interests of said policy-holders with reference to *said matter of said re-insurance.* If in fact the proposed re-insurance contract has been either submitted to or approved by the Commissioner of Insurance of the State of Indiana, said notice may so state.

8. That if said re-insurance contract shall be approved at said meeting by at least two-thirds of the policy holders present in person or represented by proxy, the business, property and assets of the defendant, Mutual Company will be transferred to the new or re-insuring company. If not so approved, then the property, business and assets of said defendant mutual company will remain in it and the business of said company will be carried on upon the assessment plan as heretofore.

9. The draft of such notice before being mailed out shall be submitted to the Court for its approval.

10. And it is further adjudged that defendants pay the costs of this action. And leave is given to withdraw from the files the papers filed in this cause. [Italics supplied.]

Thereafter, on January 6th, the following letter was sent to each policyholder of the Mutual Company:

HOOSIER CASUALTY COMPANY.

Health and Accident Insurance.

Indianapolis.

JANUARY 6, 1921.

DEAR SIR:

About November 30, 1920, you received notice of a special meeting of the policyholders to consider and pass upon a proposed contract by which the business of this company was to be transferred to a new stock company to be named The Hoosier Casualty Company, which meeting was to be held January 1, 1921.

A question has arisen as to the sufficiency of the notice given for that meeting and therefore, by agreement with the Attorney General, the meeting has been postponed to January 18, 1921.

You are further notified that since the last notice was given you, a new company has been incorporated under the laws of Indiana, named The Hoosier Casualty Company. This is a stock company with a capital of One Hundred Thousand Dollars. There being no law by which a mutual company could be changed into a stock company, a new company was incorporated. All the stock of this new company has been subscribed by the officers and employees of the present mutual company and members of their families. Its officers are the same as the officers of the mutual company.

The funds of the present mutual company are the beneficial property of its members, subject to being used as necessary to protect all policies and pay all claims and debts of the company. By a proposed contract to be submitted to this adjourned meeting on January 18, 1921, this new company would assume all policy obligations and claims for benefits, and all the debts of the present mutual company, and would have transferred to it all the property and funds of the mutual company as a consideration for being bound to pay these obligations, claims and debts. The legal effect of this is that the new stock company becomes the owner of the assets and must pay the policies, claims and debts.

This proposed contract was submitted to the Commissioner of Insurance of Indiana and has been approved by him by the following language:

" I have gone over this contract carefully and am pleased to give you herewith my approval of the same."

You are therefore hereby further notified that the adjourned meeting of the members of the mutual Hoosier Casualty Company will re-convene at the office of the company, 1510 Fletcher Savings & Trust Company Building, Indianapolis, Indiana, on January 18, 1921, at nine o'clock A. M. to consider and pass upon the proposed contract.

If this proposed contract is approved by a two-thirds vote of all members then present, it will become effective and the new stock company will take

over and own all the assets and will assume all policies and pay all claims which may now exist or arise later.

If any policy holder desires to do so and will make application to Charles H. Brackett, President, at any time before this meeting, enclosing his certified check for his subscription, he may purchase stock in the new company at par to an amount equal to an equity in the mutual company standing to the credit of his policy after all debts of that company are ascertained and paid.

Yours truly,

(Signed)      C. H. BRACKETT,<br>
*President.*

(Signed)      C. W. RAY,<br>
*Sec'y-Treas.*

The stock of the Stock Company was subscribed for as follows:

| | Shares. |
|---|---|
| C. W. Ray | 649 |
| Mrs. C. W. Ray | 1 |
| C. H. Brackett | 649 |
| Mrs. C. H. Brackett | 1 |
| W. H. Latta | 649 |
| Mrs. W. H. Latta | 1 |
| Girl in office (no name given) | 10 |
| Blanche Belser | 10 |
| Roy Callahan | 10 |
| Son of C. W. Ray | 10 |
| Brother of C. W. Ray | 10 |
| Total | 2,000 |

It appears that two policyholders in the Mutual Company each acquired a part of a share, the sum of both parts being less than one share, and that these fractional shares were taken from the shares issued to Mr. Latta. At the time of the organization of the company, stock to the amount of $50,000 was issued to the above persons and paid for in cash. While the company was in this condition and on January 18, 1921, the following contract was entered into between the Mutual Company and the Stock Company:

CONTRACT OF REINSURANCE.

THIS AGREEMENT by and between THE HOOSIER CASUALTY COMPANY hereinafter fully described and known as a stock company, party of the first part and HOOSIER CASUALTY COMPANY hereinafter fully described and known as a mutual company, party of the second part, WITNESSETH:

THAT WHEREAS, The Hoosier Casualty Company, party of the first part has been duly incorporated with an authorized capital stock of $100,000 under and pursuant to the laws of the State of Indiana, of which amount the sum of $50,000 has been paid in cash and of which payment in cash of $25,000 has been invested, as provided for in the insurance laws of the State of Indiana, and duly deposited with the Commissioner of Insurance of the State of Indiana and said Company has been duly and legally authorized by the State of

Indiana to engage in the business of accident and other insurance as provided for by the act of 1853 and is now engaged in the transaction of an insurance business under said act.

AND WHEREAS, Hoosier Casualty Company, party of the second part, is a Mutual Insurance Company organized under the act of 1897 and has been for a number of years conducting an insurance business under said act, and there are now outstanding numerous policies of said party of the second part and it has in its possession money, bonds, securities, and other property accumulated in said business and has various liabilities for claims arising out of its policies and otherwise.

AND WHEREAS, pursuant to written notice sent to each policyholder of the party of the second part more than thirty days prior to January 1st, 1921, said policyholders were each and everyone duly notified that a special meeting of said policyholders would be held at 1510 Fletcher Savings and Trust Building the City of Indianapolis, State of Indiana, at the Home Office of said Company on the first day of January, 1921, at 9:00 A. M. to consider and act upon a contract whereby all policies of said party of the second part would be taken over and reinsured by the party of the first part and at such meeting so held at said time and place, policyholders of said party of the second part by a majority of more than two thirds of the policyholders then present voted in favor of the execution of this contract, which contract was then and there read to and duly considered by them and whereas it was then ordered by said policyholders that the officers of said party of the second part be authorized and directed to execute and perform this contract, *it is now, therefore and hereby agreed.*

1. In consideration of the mutual agreements, and undertakings herein contained and the mutual advantages to be gained thereby The Hoosier Casualty Company, party of the first part, does hereby undertake and agree to fully assume and perform each and every policy of insurance heretofore issued by Hoosier Casualty Company party of the second part and now in force, in accordance with the terms of each and all of said policies, respectively and to pay to the holders thereof and each of them any and all sums which may fall due pursuant to the terms of said policies.

2. The Hoosier Casualty Company, party of the first part, further agrees to assume any and all further debt of said party of the second part made on any account whatsoever, and to pay any and all sums which said party of the second part is now or might hereafter become liable for on account of said contracts, debts or obligations, and in like manner to pay and discharge all obligations of said party of the second part which may now exist or may hereafter come into existence whether by contract or otherwise to the end that said party of the second part shall be fully relieved of all such contracts, obligations and liabilities and the same shall be fully assumed and discharged by said party of the first part.

3. And now on its part and in consideration thereof, said Hoosier Casualty Company, party of the second part does hereby make over, assign and transfer and fully vest in said The Hoosier Casualty Company, party of the first part all property, real and personal, description wherever situated, of which it may be possessed or which it may in the future be entitled to receive, to be the absolute property of the party of the first part.

4. This contract with all obligations, rights, titles, and interests hereby transferred and created, shall be in effect as, of, and including January 1st, 1921.

In Witness Whereof, we have executed this agreement in duplicate, in the city of Indianapolis, on the first day of January, 1921.

THE HOOSIER CASUALTY COMPANY,.
*Party of the First Part,*

Attest:                               By C. H. BRACKETT, *President.*
  C. W. RAY, *Secy. Treas.*

HOOSIER CASUALTY COMPANY,
*Party of the Second Part.*

Attest:                               By C. H. BRACKETT, *President.*
  C. W. RAY, *Asst. Secy.*
Approved, January 1, 1921.

—————— ——————,
*Insurance Commissioner, State of Indiana.*

On the same day the assets of the Mutual Company were transferred to the books of the Stock Company.

At a directors' meeting held on January 19, 1921, by-laws were adopted and the following appears on its minutes:

Whereas, Charles H. Brackett, C. W. Ray and W. H. Latta do now offer for the sum of Fifty Thousand Dollars cash, to cause to be assigned and transferred to this company all the outstanding automobile insurance business of the United Automobile Insurance Association, excepting only its liability risks, and with the same to cause to be paid to The Hoosier Casualty Company Sixteen Thousand and Fifty Dollars from the United Automobile Insurance Association and also to be transferred to The Hoosier Casualty Company $3,950.00 par value in bonds of United States Government and also to be paid and transferred to the Hoosier Casualty Company $5,600.00 in cash, notes, and accounts from the United Auto Agency Company and also to cause to be transferred to The Hoosier Casualty Company all the good will, agency force and pending business of the United Automobile Insurance Association.

Now Therefore the Board of Directors of the Hoosier Casualty Company hereby order and direct that said offer be accepted ,and that this Company do assume and take over all such business as a going business in its present condition, except only the liability risks of said Association, and receive said money and assets and pay to Charles H. Brackett, C. W. Ray, and W. H. Latta the sum of Fifty Thousand Dollars in cash therefor, all as of this date.

There being no further business the meeting adjourned.

JANUARY 19, 1921.

### CONTRACT.

This agreement by and between the United Auto Insurance Association by the United Auto Agency Company, its attorney in fact, party of the first part and The Hoosier Casualty Company, party of the second part witnesseth:

First. The Hoosier Casualty Company had and does hereby, in consideration of the payments and agreements therein contained, assume and agree to carry out and perform all the outstanding policies of the United Auto Insurance Association excepting only those provisions relating to the Liability of said association to third persons on account of injuries sustained for which the insured would be liable in law, and to pay any and all sums which may be now and in the future come due on account of such insurance contracts.

Second. The United Auto Insurance Association expressly reserves and retains its own liability on account of the liability clause in the policy and agrees to pay and discharge all claims that may arise thereunder.

Third. The United Auto Insurance Association further expressly assigns, transfers and conveys to The Hoosier Casualty Company the good will of its Business, its agency force and agency contracts and all pending business which it may have, to be taken over by the same, The Hoosier Casualty Company as a going business.

Fourth. The United Auto Insurance Association further contemporaneously herewith agree to and does pay to The Hoosier Casualty Company the sum of $16,050.00 in cash and does hereby assign and deliver to The Hoosier Casualty Company $3,950.00 par value in bonds of the United States Government, all from and after this date to be the property of The Hoosier Casualty Company.

Executed in duplicate this 19th day of January, 1921.

THE UNITED AUTO INSURANCE ASSOCIATION,

By THE UNITED AUTO AGENCY COMPANY,

*Its Attorney in Fact.*

By (Signed)     C. H. BRACKETT, *President.*

THE HOOSIER CASUALTY COMPANY,

By (Signed)     W. H. LATTA, *Vice President.*

Attest:

(Signed)     C. A. RAY, *Secy.-Treas.*

On the same day (January 19, 1921) an entry appears on the journal of the Stock Company, showing bonds $3,950, cash received from United Auto Association, $16,050, and cash received from the agency company, $2,272.78.

On February 19, 1921, a dividend was declared by the Stock Company of $50,000.

When the remaining $50,000 of stock was issued does not appear, but it is shown to have been issued and it is also shown that a dividend was declared which is precisely the amount due on the remaining subscribed stock.

In its verified report to the Commissioner of Insurance of the State of Indiana, the Stock Company states that it commenced business January 22, 1921. The Stock Company issued policies similar to those issued by the Mutual Company and also issued policies of automobile insurance similar to those issued by the company whose risks it took over.

OPINION.

MILLIKEN: The petitioner contends (1) that since the policyholders of the Mutual Company had the right to subscribe for stock in the Stock Company the latter was essentially the same as the former; (2) that from January 18, 1921, to January 22, 1921, the Stock Company was a life insurance company as that term is defined in section 242 of the Revenue Act of 1921; (3) that if the Stock Company was, when it took over the risks of the Mutual Company, an insurance

company other than a life or mutual insurance company and therefore falls under section 246 of the Revenue Act of 1921, then neither it nor any like company is taxable for the year 1921; and (4) that the transaction between it and the Mutual Company on January 18, 1921, was in the nature of a sale and that the net amount of assets which it received from the Mutual Company was in no sense a premium for reinsurance. These contentions will be discussed in the order set forth.

(1) In the final order entered in the action brought by the Attorney General of Indiana, it is stated:

6. *That there is no statute authorizing the re-incorporation of the defendant mutual Hoosier Casualty Company, and that the defendant The Hoosier Casualty Company is not a re-organization of that company,* and that if any of the policy-holders of said defendant Mutual Company desire to purchase any of the stock of said new company and will forward their certified check therefor to the president of the defendant mutual company, stock to an amount equal to an equity in the mutual company standing to the credit of his policy, after all debts of that company are ascertained, may be purchased and will be issued to said policyholder at par. [Italics supplied.]

If there is any merit whatever in petitioner's first contention, the above excerpt from the final order in the proceedings in the Superior Court in Marion County, Indiana, together with the fact that only a fraction of one share of a total of 2,000 shares was subscribed by policyholders in the old company other than the office force and their relatives and friends, disposes of the question adversely to petitioner.

(2) The petitioner contends that from January 18, 1921, to January 22, 1921, it was a life insurance company as that term is defined in section 242 of the Revenue Act of 1921. That section reads:

That when used in this title the term "life insurance company" means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.

The respondent contends that under the above statute the business of the petitioner, irrespective of whether it entered into the automobile insurance business or not, was not life insurance between the dates of January 18, and January 22, 1921. He points out that by far the greater portion of the risks assumed by the petitioner was for liabilities arising from accidents and health, and that but a small proportion of the liability was for natural death. In view of the conclusions we have reached on this point, it is not necessary for us to decide this question.

The contention of the petitioner is based on the assumption that on January 18, 1921, the petitioner was doing a life insurance business, and that it did not take over the automobile insurance business

until January 22, 1921. While petitioner's secretary-treasurer testified to this effect, his testimony on this point is quite uncertain. He was asked:

Q. Now, Mr. Ray, you may state upon what date in January of 1921 the transfer provided for by this contract dated January 19th actually took place, the transfer to the Hoosier Casualty Company of the property and so forth of the automobile insurance company.

A. I am not so sure of the date, whether it was the 18th or 19th or 22nd. The Court proceeding upset us on those different dates.

Q. Well, to refresh your recollection, was not the mutual Hoosier Casualty Company taken over on the 18th and insurance, or automobile insurance, taken over on the 22nd?

A. Yes, I believe that is right.

Opposed to this are the facts that the contract between the petitioner and the automobile insurance concern was made on January 19, 1921, and that the assets of that concern were set up on petitioner's books on the same day. The question of the day on which the petitioner began business is still further confused by its verified report to the Commissioner of Insurance of Indiana, wherein it is stated that it began business on January 22, 1921. The outstanding fact is that it was the primary purpose of the office force of the Mutual Company in organizing the new company to consolidate the automobile insurance concerns, all of which they controlled, with the insurance business of the Mutual Company. It was also their purpose to use the surplus funds of the Mutual Company in purchasing these other concerns and this purpose they could not accomplish until they had brought these funds under their control. As soon as they were in control they voted to pay $50,000 of said surplus funds to C. H. Brackett, C. W. Ray, and W. H. Latta for, with certain exceptions, all the outstanding automobile insurance, certain specified assets, and the good will of the United Automobile Association.

It thus appears that these transactions which took place in the space of two days were parts of a general scheme. They can not be separated. We must look to the substance and that substance is that the new corporation was organized for the purpose of acquiring the business of two existing, going concerns and this was accomplished as soon as the funds of one concern could be used to purchase the business of the other.

In order to be classified as a life insurance company, section 242 requires that an insurance company be "engaged in the business" of issuing the character of policies therein specified. It is not necessary in this case to decide what length of time must elapse or what acts must be done before a company can be said to be engaged in a business. It is sufficient to point out that the petitioner was on January 18, 1921, in the throes of birth, that on that date it had not adopted

its by-laws, that but one night intervened between the acquisition of the risks and assets of one company and those of the other, and that the acquisition of both was necessary to the fulfillment of the scheme. It can not be held that the petitioner was engaged in one class of business for a fraction of a day and over night changed its classification. It is clear that the petitioner, when it took over the risks and assets of the Mutual Company, was not a life insurance company as that term is defined in section 242 of the Revenue Act of 1921.

(3) The portions of the Revenue Act of 1921 which are applicable to the petitioner's third contention are the following:

Sec. 246. (a) That, in lieu of the taxes imposed by sections 230 and 1000, there shall be levied, collected and paid for the calendar year 1922, and for each taxable year thereafter, upon the net income of every insurance company (other than a life or mutual insurance company) a tax as follows:

(1) In the case of such a domestic insurance company the same percentage of its net income as is imposed upon other corporations by section 230.

Sec. 230. That, in lieu of the tax imposed by section 230 of the Revenue Act of 1918, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates:

(a) For the calendar year 1921, 10 per centum of the amount of the net income in excess of the credits provided in section 236; and

(b) For each calendar year thereafter, 12½ per centum of such excess amount.

Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

* 　　　 * 　　　 * 　　　 * 　　　 * 　　　 * 　　　 *

(10) In the case of insurance companies (other than life insurance companies), in addition to the above (unless otherwise allowed): (A) The net addition required by law to be made within the taxable year to reserve funds (including in the case of assessment insurance companies the actual deposit of sums with State or Territorial officers pursuant to law as additions to guarantee or reserve funds); and (B) the sums other than dividends paid within the taxable year on policy and annuity contracts. After December 31, 1921, this subdivision shall apply only to mutual insurance companies other than life insurance companies.

No good reason can be advanced why Congress should intend that insurance companies other than life or mutual companies should escape taxation for the year 1921, and petitioner advances none. It stands on the cold letter of section 246. The fallacy of this contention is that it overlooks section 230, which is expressly referred to in section 246. Section 230 provides one rate of taxation for the year 1921, and another rate for all subsequent years. It is therefore reasonable to conclude that what is meant by section 246 is that the taxes imposed therein are in lieu of the taxes imposed by section 230 for years subsequent to 1921. Petitioner also overlooks the provisions of section 234 (a) (10), which give to it and similar companies a deduc-

tion peculiar to the year 1921 alone. Here we have the contention of the petitioner that no tax is imposed for the year 1921, although Congress has granted to it and similar companies a deduction which pertains solely to that year. This results in an absurdity, and a statute should, if possible, be construed so as not to reach such a result. Thus, it is stated in section 489 of Lewis' Sutherland Statutory Construction (2d ed.) :

A construction which must necessarily occasion great public and private mischief must never be preferred to a construction that would occasion neither * * * unless the terms of the instrument absolutely require such preference. * * * A statute may be construed contrary to its literal meaning when a literal construction would result in an absurdity or inconsistency, and the words are susceptible of another construction which will carry out the manifest intention.

Construing sections 246, 230, and 234 together, the conclusion can not be escaped that it was the intention of Congress to tax the petitioner, together with similar companies, on its net income for the year 1921 under and at the rate provided by section 230(a).

(4) The transaction of January 18, 1921, between the petitioner and the Mutual Company was made pursuant to section 4753 of Burns' Annotated Indiana Statutes, which in part provides:

No such corporation, association or society, organized under the laws of this state, shall transfer its risks to, or reinsure them in any other corporation, association or society, unless the contract of transfer or reinsurance is first submitted to and approved by a two-thirds vote of a meeting of the insured, called to consider the same, of which meeting a written or printed notice shall be mailed to each member, certificate or policy holder, at least thirty days before the day fixed for such meeting.

It is well to remember at this point that the funds transferred were the equitable property of the policyholders in the Mutual Company. *Federal Life Ins. Co.* v. *Kerr*, 173 Ind. 613; 89 N. E. 398, involved a contract between the Model Life Insurance Co., an Indiana mutual insurance company, and the Federal Life Insurance Co., under which the Federal Life Insurance Co. assumed the risks of the Model Life Insurance Co. only to a limited extent. The court, in speaking of the funds transferred, said:

Appellee's insured had contributed to create the fund, and appellant had contributed nothing. In good conscience and by express statute (section 7) it was a trust fund for the policy holders of the Model, a mutual company, and is attempted to be transferred to another company without liability of the latter to account for it for the benefit of those having an interest in it. Certainly any surplus or reserve belonged to the members. *United States, etc., Co.* v. *Spinks* (Ky.) 96 S. W. 889, 13 L. R. A. (N. S.) 1053; *Parish* v. *N. Y., etc., Co.*, 60 App. Div. 11, 69 N. Y. Supp. 764.

So it appears that the policyholders of the Mutual Company agreed to the transfer of the net fund, which in equity belonged to them,

to the petitioner in consideration of the fact that they were insured by the petitioner. To say that the assumption of the general indebtedness of the Mutual Company by the petitioner played any important part in the transaction would be to overlook the facts of the case and especially the letters which the office force wrote to the various policyholders. The character of a transaction like the one under consideration is thus stated by Cooley in his Briefs on the Law of Insurance, vol. I, p. 517:

> Thus, where one company assumes all the risks of another company retiring from business, entering into a contract to protect the retiring company from liability on the policies assumed, this is properly a reinsurance contract or policy.

While the term " reinsurance " includes a contract whereby one insurance company agrees to indemnify another insurance company on account of risks which the latter is carrying and continues to carry, it also includes a contract such as we have before us. This is in accord with the decision in *People* v. *American Central Ins. Co.*, 179 Mich. 371; 146 N. W. 235, where it is said:

> The term " reinsurance " has two meanings. When a fire insurance company, with the consent of the insured, is substituted for another fire insurance company, so that the insured releases the original insurer and looks to the substituted company alone, reinsurance has been effected. A company desiring to cease doing business entirely, or in a particular state, may thus reinsure its risks.

Compare *Federal Life Ins. Co.* v. *Kerr, supra; Federal Life Ins. Co.* v. *Barnett*, 71 Ind. App. 613; 125 N. E. 522; *Johannes* v. *Phoenix Ins. Co.*, 66 Wis. 50; 27 N. W. 414; *Meyer* v. *National Surety Co.*, 90 N. J. L. 126; 100 Atl. 164; *Weil* v. *Federal Life Ins. Co.*, 264 Ill. 425; 106 N. E. 246.

The net surplus was paid to the petitioner in consideration of its contract to reinsure the members of the Mutual Company. This payment falls within the following definition of the term " premium " found in 32 C. J., p. 1192:

> The word " premium ", in the law of insurance, has a well settled and specific meaning which is well understood. In its proper and accepted sense it means the amount paid to the company as consideration for insurance; the consideration for a contract of insurance; the consideration paid for a policy of insurance; the amount paid or agreed to be paid in one sum or periodically to insurer as the consideration for a contract of insurance; the sum which insured is required to pay.

In *McPherson Hail Ins. Co.* v. *Shaw*, 113 Kan. 772; 212 Pac. 873, it is said:

> The word " premium " appears to be the proper term to use, in designating the sum which one insurance company pays to another on its reinsurance contract. *People ex rel. Continental Ins. Co.* v. *Miller*, 177 N. Y. 515, 70 N. E. 10; *St. Nicholas Ins. Co.* v. *Mercantile Mutual Ins. Co.*, 5 Bosw. (N. Y.) 238;

*Insurance Co.* v. *Insurance Co.*, 38 Ohio St. 11, 43 Am. Rep. 413; *National Ins. Co.* v. *Metropolitan Ins. Co.*, 226 Ill. 102, 113, 80 N. E. 747.

It is clear that the supreme and controlling consideration for the transfer of the net assets of the Mutual Company was the fact that the old policyholders secured from the petitioner the same character of insurance which had been furnished them by the Mutual Company. To put it another way, the policyholders agreed to the payment to the petitioner of the net surplus in consideration of its substituting itself for the Mutual Company. In short, the consideration for the transfer was insurance and therefore, the net surplus paid over to the petitioner was a premium paid in one sum for insurance. These views correspond with the construction placed on this transaction by the Superior Court of Marion County, Ind., in its order, set forth in the findings of fact, and in compliance with which the petitioner obtained possession of the assets of the Mutual Company.

It is contended by the petitioner that the net surplus can not be treated as a premium for reinsurance for the reason that it greatly exceeds, as petitioner asserts, the amount necessary to procure such reinsurance. This only means that the petitioner made an extremely good bargain. If so, it is a matter with which we have no concern.

*Judgment will be entered for the respondent.*